# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

MAR 3 0 2006

JOHN F. CORCORAN, CLERK
BY
DEPUTY CLERK

|  |  |  |
|---|---|---|
| **BRENDA LEE STILTNER,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:05cv00075 |
| | ) | **MEMORANDUM OPINION** |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | By:  GLEN M. WILLIAMS |
| Defendant. | ) | Senior United States District Judge |
| | ) | |
| | ) | |

In this social security case, the court affirms the final decision of the Commissioner denying benefits.

## I. Background and Standard of Review

The plaintiff, Brenda Lee Stiltner, ("Stiltner"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying the plaintiff's claims for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq*. (West 2003 & Supp. 2005). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more

than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws,* 368 F.2d at 642).

Stiltner filed her current application for SSI on or about April 16, 2003, alleging disability as of April 11, 2003, due to severe back and leg pain, severe nerves and depression. (Record, ("R."), at 79-82, 86-95.) Her claim was denied initially and on reconsideration. (R. at 51-56, 59-61.) Stiltner then requested a hearing before an administrative law judge, ("ALJ"). (R. at 62-63.) The ALJ held a hearing on February 17, 2004, during which Stiltner was represented by counsel. (R. at 264-82.)

On April 27, 2004, the ALJ issued an unfavorable decision. (R. at 266.) However, Stiltner appealed the decision to the Appeals Council, which reviewed the case and determined that further explanation of certain evidence was necessary and remanded the case to the ALJ for the taking of additional testimony. (R. at 67-70, 266.) On February 8, 2005, the ALJ held another hearing in accordance with the Appeal Council's remand order, at which Stiltner was represented by counsel. (R. at 248-63.)

By decision dated February 25, 2005, the ALJ again denied Stiltner's claim. (R. at 14-23.) The ALJ found that Stiltner had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 22.) The ALJ found that Stiltner suffered from severe anxiety, depression and pain in her back, legs, hips, left arm and left shoulder. (R. at 22.) The ALJ found, however, that Stiltner did not have an impairment or combination of impairments that met or medically equaled one of the

Case 1:05-cv-00075-GMW-PMS   Document 15   Filed 03/30/06   Page 2 of 31   Pageid#: 56

listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 22.) The ALJ also found that Stiltner's allegations regarding her limitations were not totally credible. (R. at 22.) After considering the medical opinions of record regarding the severity of Stiltner's impairments and the testimony from a vocational expert, the ALJ found that Stiltner had the residual functional capacity to perform simple, unskilled light[1] work that did not expose her to excessive stress and did not involve interaction with the public. (R. at 22.) Based on Stiltner's residual functional capacity, the ALJ found that Stiltner was unable to perform her past relevant work. (R. at 22.) The ALJ determined that there were a significant number of jobs in the national economy that Stiltner could perform, such as work as a food service worker, sandwich maker, salad bar attendant, maid, office cleaner, laundry worker, hand packer, bagger and off bearing and preparation cook. (R. at 22.) Thus, the ALJ found that Stiltner was not under a disability as defined by the Act at any time through the date of the decision and not eligible for benefits. *See* 20 C.F.R. § 416.920(g) (2005).

After the ALJ issued his opinion, Stiltner pursued her administrative appeals, (R. at 10), but the Appeals Council denied her request for review. (R. at 7-9.) Stiltner then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2005). The case is before this court on Stiltner's Brief In Support Of Plaintiff's Motion For Summary Judgment filed January 20, 2006. (Docket Item No. 12), and the Commissioner's Motion For Summary Judgment filed February 15, 2006, (Docket Item No. 13.)

---

[1]The Social Security regulations define "light work" as work that involves lifting objects weighing no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. If someone can do light work, she also can do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time. 20 C.F.R. § 416.1567(b) (2005).

## II. Facts

Stiltner was born in 1961, (R. at 251), which classifies her as a younger person under 20 C.F.R. § 416.963(c) (2005). Stiltner completed the seventh grade and has past relevant work experience as a cashier and nurse assistant. (R. at 252, 280.)

At her hearings, Stiltner testified that her condition had worsened since her previous hearings before an ALJ. (R. at 268.) Stiltner stated that she was unable to work because of her nerves, which caused her to cry frequently. (R. at 253, 268.) Stiltner estimated that she cried as often as four, five or six times a day, although there appeared to be no catalyst for her crying. (R. at 270-71.) Stiltner further testified that her emotional problems affected her ability to tolerate crowds and confined spaces. (R. at 271.) Indeed, Stiltner testified that she quit her last job as a cashier after a few days because of her nerves. (R. at 259.) Stiltner stated that she had difficulty concentrating, focusing and staying on task. (R. at 271.) Stiltner explained that she had experienced problems with her nerves since she was nine years old. (R. at 253.) Despite the longevity of her emotional problems, Stiltner testified that she had not seen a mental health professional on a regular basis. (R. at 268.) In fact, Stiltner stated that she had not visited a counselor in more than 12 years and had never seen one specifically for her nerves. (R. at 258, 274.) Stiltner further complained of fluctuations in her weight. (R. at 274.) Stiltner also testified that she took Effexor for depression, which she had taken for 15 years, and Ativan for anxiety, which she had taken for 22 years. (R. at 271-72.) Stiltner stated that these medications sometimes helped with her symptoms, although she continued to suffer from crying spells. (R. at 272-73). Stiltner further lamented that the Ativan caused drowsiness (R. at 272-73.)

-5-

Stiltner also complained of pain in her legs and back, which prevented her from working. (R. at 254, 268.) Stiltner described the leg pain as severe on a frequent basis and as causing a sensation of fire on the bottoms of her feet. (R. at 259, 268.) Stiltner estimated that she could not stand without rest for more than seven to 10 minutes. (R. at 255, 269.) Stiltner further testified to limitations in sitting, walking, bending, stooping, squatting, crawling and gripping. (R. at 255, 270.) Stiltner testified that she could walk for no more than 10 to 15 minutes without experiencing numbness. (R. at 255.) Stiltner stated that gripping, in particular, was difficult due to the third finger on her right hand, which had previously been broken and now contained screws that prevented bending. (R. at 254, 270.) Stiltner also said that she felt tingling at the ends of her fingers that radiated into the back of her neck. (R. at 254.) With regard to her back pain, Stiltner indicated that she experienced lower back pain that prevented her from rising after squatting and caused numbness in her right hip. (R. at 254.) Stiltner testified that she took Lorcet Plus for her pain, which she had taken for 15 years. (R. at 272.) Stiltner stated that the Lorcet Plus interfered with her sleep, which left her fatigued and tired. (R. at 255, 273.) Stiltner indicated that she had recently starting taking Mobic for pain in her legs and feet but had not noticed any improvement. (R. at 273.) Stiltner also testified to a breathing problem, for which she had taken Advair for the past six or eight months, and to allergies, for which she took Zyrtec. (R. at 257, 273.) Stiltner said that the Zrytec caused drowsiness. (R. at 258.)

When asked to describe her lifestyle, Stiltner testified that she lived alone and stayed at home most of the time. (R. at 270.) Stiltner stated that she very seldom went to the supermarket and did not spend time with anyone, not even friends or relatives, although her mother checked on her occasionally. (R. at 270, 272, 274.) Stiltner denied engaging in any hobbies or activities that would bring enjoyment or pleasure. (R. at 272.) Stiltner further denied visiting a doctor on a regular basis, even though she

Case 1:05-cv-00075-GMW-PMS   Document 15   Filed 03/30/06   Page 5 of 31   Pageid#: 59

admitted that she probably could receive appropriate treatment for her condition. (R. at 268.) Stiltner testified that she had not driven in almost a year due to her nerves. (R. at 256.) Stiltner also explained that she did no housework but was able to dress and feed herself. (R. at 256.)

Cathy Sanders, an independent vocational expert, was next to testify at Stiltner's first hearing. (R. at 260.) Sanders was asked to consider Stiltner's past work experience. (R. at 260.) Sanders described the position of certified nurse assistant as "heavy and semi-skilled" and a position in food preparation as "light and unskilled." (R. at 260.) Sanders was then asked to consider Stiltner's age, education, past relevant work experience and residual functional capacity with the following limitations: no lifting of items weighing more than 20 pounds occasionally and 10 pounds frequently and no regular interaction with the general public (R. at 260.) Sanders testified that there were jobs in the regional and national economy that Stiltner could perform such as food preparation, packager, machine tender, cleaner, stock clerk, machine feeder and non-construction laborer, where there were approximately 593,000 such jobs in the regional economy and 593,000 in the national economy. (R. at 261.) Sanders was asked to further assume that Stiltner had a poor ability to function in 11 areas, no ability to function in two areas and a satisfactory ability to perform simple tasks and maintain her personal appearance. (R. at 261.) Based on these additional limitations, Sanders determined that there would be no jobs for Stiltner in the regional or national economy. (R. at 261.) Sanders further testified that if Stiltner could not maintain a safe or reliable level of mental alertness, that limitation, in and of itself, would eliminate all jobs from her job base. (R. at 262.)

At Stiltner's second hearing, a medical expert, Dr. Thomas Schacht, M.D., testified following Stiltner. (R. at 275.) Dr. Schacht noted that the only treatment in

the record for Stiltner's emotional issues was with her primary care physician. Dr. Schacht also highlighted that the record was silent with respect to the target symptoms, for which Stiltner was placed on Ativan, and Stiltner's response to treatment. (R. at 276.) Dr. Schacht further noted the absence of documentation as to the length of time Stiltner had taken Effexor, although the record did indicate that Stiltner requested it in June 2003. (R. at 276.) Dr. Schacht testified that the record did not identify the target symptoms, for which Stiltner was prescribed Effexor, or the diagnosis given. (R. at 276.) Dr. Schacht stated the record contained no other mention of Effexor until June 14, 2004. (R. at 276.) Dr. Schacht further noted that despite her doctor's recommendation, the record contained no evidence that Stiltner visited a psychiatrist. (R. at 276.)

The ALJ asked Dr. Schacht to address Stiltner's IQ scores, to which Dr. Schacht testified that Brian Warren, Ph.D., assessed that Stiltner had a full-scale IQ score of 62 and that she would function at this level for life. (R. at 276.) However, Dr. Schacht noted that Warren provided no basis for this opinion. (R. at 276.) Dr. Schacht indicated that Stiltner's school records show that she repeated the first grade and failed the eighth grade because of massive absenteeism. (R. at 276-77.) Dr. Schacht also stated that the school records reveal that Stiltner's early elementary school achievement tests were well above average, but her scores dropped over the years. (R. at 277.) Dr. Schacht surmised that the record was consistent with social deprivation but did not suggest that Stiltner was a mentally retarded child. (R. at 277.) Dr. Schacht further testified that Warren's Personality Assessment Inventory, ("PAI"), of Stiltner, while indicating "possible negative impression management" that did not disqualify the test from analysis, should be disqualified from analysis because Dr. Schacht's narrative in the body of the report indicated that Stiltner's mother helped her with the testing. (R. at 277.) Dr. Schacht stated that a later PAI of Stiltner was disqualified by the examiner

due to an elevated score on the infrequency scale, which the examiner attributed to random responding. (R. at 278.) Dr. Schacht testified that the examiner was mistaken, as random responding would affect the inconsistency scale and not the infrequency scale. (R. at 278.) Based on his review of the documents and the testimony, Dr. Schacht was unable to form an opinion as to Stiltner's diagnoses due to the very limited record. (R. at 278.) Dr. Schacht testified that Stiltner's impairment could simply be the iatrogenic substance dependence based on the prescription of multiple addictive drugs over a long period of time with minimal documentation, or alternatively, it could be something as serious as a significant anxiety and depressive disorder. (R. at 278-29.)

The next to testify at this hearing was Dr. Norman Hankins, Ph.D., an independent vocational expert. (R. at 280.) Dr. Hankins was asked to consider Stiltner's past work experience. (R. at 280.) Dr. Hankins described the position of cashier as "light and unskilled" and the position of nurse assistant as "medium and semi-skilled." (R. at 280.) Dr. Hankins was then asked to consider Stiltner's age, education, past relevant work experience and residual functional capacity that allowed her to engage in simple, low-stress jobs with the following limitations: no lifting of items weighing more than 20 pounds occasionally and 10 pounds frequently and no regular interaction with the general public (R. at 280-81.) Sanders testified that there were jobs in the regional and national economy that Stiltner could perform such as food service work, where Stiltner could make sandwiches and salads, tend to a salad bar or prepare food for cooking. (R. at 281.) Dr. Hankins also testified that Stiltner could work as a maid or office cleaner and could possibly do work in laundries or factories. (R. at 281.) Dr. Hankins stated that there were approximately 70,000 to 75,000 such jobs in the regional economy and more 3 million in the national economy. (R. at 281.) Sanders was asked to further assume that Stiltner had a poor ability to function in 11

areas, no ability to function in two areas and a satisfactory ability to perform simple tasks and maintain her personal appearance. (R. at 281-82.) Based on these additional limitations, Sanders determined that there would be no jobs for Stiltner in the regional or national economy. (R. at 282.)

In rendering his decision, the ALJ reviewed medical records from Dr. Faisal Chaudhry, M.D.; R.J. Milan, Jr., Ph.D., a state agency psychologist; Dr. Frank M. Johnson, M.D., a state agency physician; Brian E. Warren, Ph.D.; Washington Square Clinic; Dr. Richard M. Surrusco, M.D., a state agency physician; Howard Leizer, Ph.D.; a state agency psychologist; Donald Hiers, Ph.D.; and William E. Stanley.

On October 5, 2001, Stiltner visited Washington Square Clinic with complaints of laryngitis, an inability to breathe well, loss of appetite and problems choking up. (R. at 144.) Stiltner also needed refills on Soma, Ativan and Lorcet Plus. (R. at 144.) Upon an examination, Dr. J.H. McVey, M.D., noted that Stiltner's chest had expiratory wheezes and a few course rhonchi. (R. at 144.) Dr. McVey also documented Stiltner's hoarseness and cough. (R. at 144.) Stiltner was diagnosed with an upper respiratory tract infection with laryngitis, otitis and pharyngitis. (R. at 144.) Dr. McVey prescribed Stiltner Decadron and DepoMedrol and gave her samples of Claritin, Nasocort and Azmacort. (R. at 144.) Dr. McVey further advised Stiltner to take Z-Pak. (R. at 144.)

Stiltner returned to Washington Square Clinic on November 16, 2001, complaining of sinus pressure around her eyes and forehead. (R. at 143.) Stiltner also requested a refill of Lorcet Plus and Soma. (R. at 143.) Dr. McVey assessed Stiltner with recurrent allergies and whelps that were cleared with Zyrtec. (R. at 143.) Dr. McVey noted that Stiltner had been scheduled for allergy testing but had been

unable to keep her appointment. (R. at 143.) Stiltner was prescribed Decadron and DepoMedrol, Avelox and Lorcet Plus and advised to continue with Flonase. (R. at 143.)

On December 6, 2001, Stiltner visited Washington Square Clinic with complaints of pain in her cocyx, which had been present for two weeks, and numbness in her little finger on the right hand. (R. at 142-43.) Dr. McVey diagnosed Stiltner with numbness of her right fourth finger, which was probably caused by trauma, chronic low back pain and sacral pain, obesity and chronic muscle spasm in her lower back. (R. at 142.) Dr. McVey discussed with Stiltner the possibility of reducing her intake of Lorcet Plus. (R. at 142.)

Stiltner returned to Washington Square Clinic on January 17, 2002, complaining of bilateral earache, croupy cough, head congestion, drainage from sinuses and headache. (R. at 141.) Dr. McVey found both of Stiltner's ears to be inflamed and foggy. (R. at 141.) Dr. McVey diagnosed Stiltner with URI, pharyngitis, sinusitis and bilateral otitis. (R. at 141.) Stiltner was prescribed Decadron and DepoMedrol, Zyrtec, Nasacort, Cipro, Lorcet Plus and Phenergan Expectorant VC with Codeine. (R. at 141.)

On February 13, 2002, Stiltner visited Washington Square Clinic to obtain refills on her medicine. (R. at 140.) Stiltner informed Dr. McVey that she was experiencing many family crises, although she generally felt pretty good. (R. at 140.) A physical examination revealed that Stiltner's blood pressure had improved, possibly as a result of a weight lifting program. (R. at 140.) Dr. McVey diagnosed Stiltner with hypertension, obesity and recent sinusitis and prescribed Zyrtec, Nasacort,

-11-

Lorcet Plus and Ativan. (R. at 140.)

Stiltner returned to Washington Square Clinic on March 15, 2002, complaining of headache, sweating, chilling, chest congestion and nonproductive cough. (R. at 139.) Stiltner also complained of dizziness. (R. at 139.) Stiltner requested prescriptions for Lorcet Plus and Soma. (R. at 139.) Dr. McVey diagnosed Stiltner with an upper respiratory tract infection with rhinitis, bronchitis, chronic muscle spasm and sinusitis. (R. at 139.) Dr. McVey warned Stiltner of the addictiveness of Soma and advised her to decrease her dosage over the next few months. (R. at 139.) Stiltner also was prescribed Decadron and DepoMedrol, Lorcet Plus and Zyrtec. (R. at 139.)

On April 22, 2002, Stiltner visited Washington Square Clinic for a refill on her pain medication. (R. at 138.) During the visit, Stiltner complained of a dry cough. (R. at 138.) She was assessed with an upper respiratory tract infection with rhinitis, mild bronchitis, chronic muscle spasm and sinusitis. (R. at 138.) Dr. McVey once again counseled Stiltner to wean off of Soma and also advised her to decrease her frequency of Lorcet Plus. (R. at 138.)

Stiltner visited Washington Square Clinic on June 12, 2002, after she developed a knot in the center of her chest while roofing a building. (R. at 137.) Stiltner stated that the pain was in her xiphoid process and spanned to her right pectoral muscle and then to her right axilla. (R. at 137.) Stiltner requested refills of Ativan and Lorcet Plus. (R. at 137.) An EKG was performed and appeared totally normal. (R. at 137.) Dr. McVey noted that Stiltner's xiphoid process was normal, and it appeared as if metal was protruding from Stiltner's right fourth finger. (R. at

-12-

137.) Dr. McVey advised Stiltner to take Flexeril for myalgia of the chest wall and pectoral muscles and referred her to Dr. O'Saile for removal of the protruding metal in her finger. (R. at 137.)

On September 11, 2002, Stiltner visited Washington Square Clinic with complaints of chills, diarrhea, abdominal pain and cramping and chronic low back pain. (R. at 136.) Stiltner indicated that she was scheduled for an appointment at the University of Virginia for treatment of her finger. (R. at 136.) Dr. McVey assessed Stiltner with acute gastroenteritis, for which he placed her on Flagyl for six days. (R. at 136.) Dr. McVey gave Stiltner Lomotil for diarrhea and advised her to stay on a liquid diet. (R. at 136.) Stiltner requested refills of both her pain and nerve medication and informed Dr. McVey that she intended to obtain SSI for her nerves. (R. at 136.) Dr. McVey advised Stiltner that she would have to see a psychiatrist before she could obtain a disability determination based on her nerves. (R. at 136.)

Stiltner returned to Washington Square Clinic for refills on her medicine on March 14, 2003. (R. at 135.) Dr. McVey noted in the record that Stiltner had not smoked in over a year and was working on losing weight. (R. at 135.) Stiltner stated that she had felt pretty good and was excited about having a grandchild. (R. at 135.) Dr. McVey diagnosed Stiltner with nasal allergies, recurrent headaches that responded to Lorcet Plus, obesity and chronic low back pain, prescribed Lorcet Plus and Ativan and gave Stiltner Zyrtec samples. (R. at 135.)

On April 16, 2003, Dr. McVey documented that in his opinion, Stiltner was totally and permanently prevented from gainful employment because of severe chronic back and leg pain and severe anxiety and depression. (R. at 134.)

-13-

Stiltner visited Washington Square Clinic on June 12, 2003, presenting complaints of tingling in her left finger tips that radiated into the left side of her neck and shoulder. (R. at 204.) Stiltner also reported numbness in her right hip and tingling and pain in both feet. (R. at 204.) Stiltner requested a refill of Lorcet Plus and a prescription for Effexor. (R. at 204.) Dr. McVey determined that Stiltner had probable polyneuropathy of her left arm and left hand, for which he recommended she see Dr. M.R. Patel, M.D. (R. at 204.)

On July 8, 2003, Stiltner returned to Washington Square Clinic with complaints of a right earache and a cough. (R. at 203.) Stiltner informed Dr. McVey that she scheduled an appointment with Dr. Patel for a polyneuropathy study. (R. at 203.) Dr. McVey's examination of Stiltner's right ear showed evidence of external otitis. (R. at 203.) Stiltner was diagnosed with possible polyneuropathy of her left arm, right external otitis and allergic rhinitis. (R. at 203) Dr. McVey gave Stiltner samples of Nasonex and Zyrtec, prescribed Lorcet Plus and Ativan and instructed her to use Cortisporin in her right ear. (R. at 203.)

On July 20, 2003, Dr. Faisal Chaudhry, M.D., conducted a medical consultative examination of Stiltner. (R. at 145-48.) Stiltner's chief complaints were generalized anxiety disorder, chronic low back pain with leg radiculitis and left wrist pain. (R. at 145.) Dr. Chaudhry referred Stiltner to a radiologist for images of her lumbar spine. (R. at 149.) X-rays showed degenerative spur of the vertebral bodies as well as disc space narrowing at L4-5 and L5-S1 levels. (R. at 149.) Dr. Chaudhry diagnosed Stiltner with chronic mechanical low back pain with leg radiculitis, chronic anxiety disorder with mild social phobia and possible left wrist carpal tunnel syndrome. (R. at 148.) Dr. Chaudhry determined that Stiltner could stand and walk

-14-

for about four hours in an eight-hour workday and could sit for similar duration. (R. at 148.) Stiltner stated that her lifting and carrying was limited to about 15 pounds frequently and 20 pounds occasionally. (R. at 148.) Dr. Chaudhry found that Stiltner could kneel, crawl and squat only occasionally because of her back and leg pain. (R. at 148.) No other manipulative limitations were noted. (R. at 148.) Dr. Chaudhry indicated that a psychiatric evaluation was needed to improve Stiltner's interaction and to increase her participation in daily living. (R. at 148.)

Stiltner visited Washington Square Clinic on August 18, 2003, complaining of a sore throat and menstrual cycles that varied from short to lasting 12 days. (R. at 202.) Dr. McVey diagnosed Stiltner with acute pharyngitis, dysmenorrhea and metrorrhagia, improving right external otitis and improving allergic rhinitis. (R. at 202.) Dr. McVey gave Stiltner samples of Alesse to help regulate her menstrual cycles and a sample of Ancef. (R. at 202.) Dr. McVey also prescribed Lorcet Plus and gave Stiltner Lincomycin. (R. at 202.)

Although the date is unknown, Stiltner visited the Washington Square Clinic following the August 18, 2003, appointment, with complaints of headache, earache, sore throat, leg pain, low back pain and congestion. (R. at 201.) Dr. McVey noted that Stiltner's congestion was probably secondary to serous otitis. (R. at 201.) Stiltner was given samples of Biaxin and Rhinocort and prescribed Zyrtec. (R. at 201.)

R.J. Milan, Jr., Ph.D., a state agency psychologist, completed a Psychiatric Review Technique Form, ("PRTF"), for Stiltner on September 5, 2003. (R. at 162-74.) In the PRTF, Milan concluded that Stiltner had an anxiety-related disorder that

-15-

was nonsevere but that she also had a coexisting nonmental impairment that required referral to another medical speciality. (R. at 162.) Milan determined that Stiltner's anxiety-related disorder did not precisely satisfy the diagnostic criteria for disability benefits and that the disorder was mild. (R. at 157.) Milan found that Stiltner was mildly limited in activities of daily living, in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 162.) Milan found that Stiltner was not limited by repeated episodes of decompensation. (R. at 162.) Milan indicated that Stiltner's allegation of disability due to a mental disorder was partially credible, as the record revealed no psychiatric treatment or severe mental statute abnormalities. (R. at 166.)

Also on September 5, 2003, Dr. Frank M. Johnson, M.D., a state agency physician, completed a Residual Physical Functional Capacity Assessment for Stiltner. (R. at 167-74.) Dr. Johnson concluded that Stiltner could occasionally lift and/or carry items weighing up to 50 pounds, frequently lift and/or carry items weighing up to 25 pounds, stand and/or walk about six hours in an eight-hour workday and sit with normal breaks for six hours in an eight-hour workday. (R. at 168.) Dr. Johnson assessed that Stiltner was unlimited in her capacity to push and pull, other than as indicated for lifting and/or carrying. (R. at 168.) Dr. Johnson found Stiltner's allegations partially credible, as his examination revealed normal motor skills, sensation and gait with only slightly reduced range of motion. (R. at 169.) Dr. Johnson found no postural, manipulative, visual, communicative or environmental limitations. (R. at 172.) These findings were affirmed on October 17, 2003, by Dr. Randall Hays, M.D., another state agency physician. (R. at 174.)

On September 30, 2003, Brian E. Warren, Ph.D., performed a psychological

-16-

evaluation on Stiltner. (R. at 179-96.) Warren administered to Stiltner the Wechsler Adult Intelligence Scale-III IQ test, ("WAIS-III"), a Pain Patient Profile, ("P3"), a Personality Assessment Inventory, ("PAI"), and a Mental Status Examination. (R. at 179.) Stiltner's mother assisted Stiltner with the paper and pencil testing portions of the examination because Stiltner was unable to complete them on her own. (R. at 179.) In describing Stiltner's appearance and demeanor, Warren stated, "she appeared immediately as a depressed individual who was restless and fidgety and in obvious pain. She was extremely anxious and tremulous. She did not smile or make good eye contact. She appeared to be very tired. She was well oriented." (R. at 180.) Warren further found that Stiltner's depression and pain pervasively interfered with all aspects of her daily life, and she was in need of aggressive treatment for depression and anxiety. (R. at 181.) The WAIS-III revealed that Stiltner had a full-scale IQ score of 62, exceeding only one percent of adults her age. (R. at 181.) Stiltner's verbal IQ score was 65, a score above those of one percent of her peers, and her performance IQ score was 64, a score falling in the first percentile compared to her age mates. (R. at 181.) Warren found these results to be an accurate measure of Stiltner's current level of intellectual functioning and surmised that it was likely Stiltner had performed at this level of ability throughout her life. (R. at 181.)

Stiltner's PAI suggested negative impression management because of atypical patterns of responding and an unusual combination of clinical features. (R. at 181.) However, Warren did not think that these findings disqualified the profile from clinical analysis. (R. at 181.) Stiltner's profile suggested thinking and concentration problems associated with strong somatic preoccupation, excessive worry and rumination and significant symptoms of depression and anxiety and low physical and psychological energy. (R. at 181.) Stiltner's profile was further characterized by

-17-

interpersonal aloofness, social isolation and alienation. (R. at 181.) Overall, the profile suggested diagnoses of major mood and anxiety disorders. (R. at 181.)

Stiltner's P3 scores fell in the above average range when compared to the pain patient sample. (R. at 182.) Stiltner's score suggested that her attention and concentration were likely hampered by her preoccupation with somatic concerns. (R. at 182.) Warren determined that Stiltner's preoccupation with her chronic symptoms would make her a poor candidate for treatment and rehabilitation, thereby giving her a poor prognosis. (R. at 182.) Warren diagnosed Stiltner with a recurrent and severe major depressive disorder, a generalized anxiety disorder, social phobia, agoraphobia, mental retardation, a personality disorder and chronic pain. (R. at 183.) Warren found that Stiltner, in a work setting, would have extreme difficulty coping with stress, could not relate effectively with peers or supervisors and could not maintain a safe or reliable level of mental alertness. (R. at 182.) Warren rated Stiltner's reliability and emotional stability as poor. (R. at 182.)

Warren also completed an Assessment To Do Work-Related Activity for Stiltner. (R. at 188.) Warren indicated that in making occupational adjustments, Stiltner had a poor ability to follow work rules, to relate to co-workers, to use judgment, to interact with supervisors, to function independently and to maintain attention/concentration. (R. at 188.) Warren further found that Stiltner had no ability to deal with the public or to deal with work stresses. (R. at 188.) In evaluating Stiltner's ability to make performance adjustments, Warren determined that Stiltner had a fair ability to understand, remember and carry out simple job instructions and a poor ability to understand, remember and carry out detailed instructions and complex job instructions. (R. at 188.) Warren also determined that in making

-18-

personal and social adjustments, Stiltner had a fair ability to maintain her personal appearance, while she had a poor or no ability to behave in an emotionally stable manner, to relate predictably in social situations or to demonstrate reliability. (R. at 188.)

Stiltner returned to Washington Square Clinic on October 17, 2003, reporting sinus congestion, headache, earaches in both ears, a sore throat, leg pain and back pain. (R. at 200.) Dr. McVey assessed Stiltner with congestion, probably secondary to serous otitis, and polyneuropathy of the left arm and hand. (R. at 200.) Stiltner was given Zyrtec samples, prescribed Lorcet Plus and instructed to use Rhinocort spray. (R. at 200.)

On November 17, 2003, Stiltner visited Washington Square Clinic with complaints of chest and head congestion and a sore throat, all of which was improving with time. (R. at 199.) Dr. McVey's examination revealed that Stiltner had a few course rhonchi in her chest, but not very many, and her throat was mildly inflamed. (R. at 199.) Dr. McVey diagnosed Stiltner with an upper respiratory tract infection, pharyngitis, rhinitis and mild bronchitis. (R. at 199.) Dr. McVey gave Stiltner Decadron and DepoMedrol and samples of Nasacort and prescribed Biaxin and Pneumotuss for Stiltner's cough and congestion. (R. at 199.)

Stiltner returned to Washington Square Clinic on December 30, 2003, requesting a refill of Ativan. (R. at 198.) Stiltner also complained of achiness and a runny nose. (R. at 198.) Stiltner was given samples of Zyrtec and Astelin and prescribed Decadron and DepoMedrol and Patanol. (R. at 198.)

-19-

On March 3, 2004, Stiltner visited Washington Square Clinic where she was diagnosed with fever blisters on her mouth and nose, allergic rhinitis and chronic back pain. (R. at 237.) Stiltner was given Dylix samples and Lorcet Plus, but was again advised to try to reduce her dosage of Lorcet Plus. (R. at 237.)

Stiltner returned to Washington Square Clinic on April 9, 2004, for an earache and a sore throat. (R. at 236.) Stiltner also expressed concern that she might suffer from bipolar disorder, as her sister suffered from the disorder. (R. at 236.) Dr. McVey assessed Stiltner with an upper respiratory tract infection with post nasal drip and cough and chronic back pain, advised her to continue Lorcet Plus and her medicine for rhinitis and prescribed Phenergan Expectorant VC with Codeine. (R. at 236.)

On May 4, 2004, Stiltner visited Washington Square Clinic with complaints of pain in both sides of her ribs. (R. at 235.) Dr. McVey determined that the pain was most likely due to a strain or bruise of Stiltner's ribs. (R. at 235.) Dr. McVey diagnosed Stiltner with chronic back pain and refilled Stiltner's prescription for Ativan. (R. at 235.)

Stiltner returned to Washington Square Clinic on June 14, 2004, for a refill of Lorcet Plus. (R. at 234.) Stiltner was assessed with sun sensitivity and chronic back pain. (R. at 234.) She was advised to avoid sun exposure and to use sunblock while outside. (R. at 234.)

On July 14, 2004, Dr. Richard M. Surrusco, M.D., a state agency physician, completed a Residual Functional Capacity Assessment for Stiltner. (R. at 206-13.)

-20-

Dr. Surrusco concluded that Stiltner could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, stand and/or walk about six hours in an eight-hour workday and sit with normal breaks for six hours in an eight-hour workday. (R. at 207.) Dr. Surrusco assessed that Stiltner was unlimited in her capacity to push and pull, other than as indicated for lifting and/or carrying. (R. at 207.) Dr. Surrusco formed his opinion based on the lack of significant changes in Stiltner's physical condition since the ALJ's denial of benefits on April 27, 2004. (R. at 208.) While Dr. Surrusco acknowledged that prior records revealed that Stiltner had some spinal abnormality, he found no significant abnormality related to range of motion and strength and that Stiltner retained her light residual functional capacity. (R. at 208.) Dr. Surrusco found no postural, manipulative, visual, communicative or environmental limitations. (R. at 211.)

Also on July 14, 2004, Howard Leizer, Ph.D., a state agency psychologist, performed a Mental Residual Functional Capacity Assessment and completed a PRTF on Stiltner. (R. at 214-31.) Leizer found that Stiltner was not significantly limited in her ability to remember locations and work-like procedures, to understand and remember very short and simple instructions, to carry out very short and simple instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being distracted by them, to make simple work-related decisions and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest

-21-

periods. (R. at 214-15.) Leizer found that Stiltner was moderately limited in her ability to understand and remember detailed instructions and to carry out detailed instructions. (R. at 214.) Leizer also found that Stiltner was not significantly limited in her ability to interact appropriately with the general public, to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others. (R. at 215.) Leizer found no limitation on Stiltner's ability to be aware of normal hazards and to take appropriate precautions or to travel in unfamiliar places or use public transportation. (R. at 215.)

In the PRTF, Leizer concluded that Stiltner had an affective disorder, mental retardation and an anxiety-related disorder, all of which needed to be assessed to determine whether they would support an award of SSI. (R. at 218.) Leizer indicated that Stiltner's depression did not precisely satisfy the diagnostic criteria of the listings. (R. at 221.) Leizer also found that Stiltner's IQ score did not precisely satisfy a finding of mental retardation according to the listings. (R. at 222.) Leizer found that Stiltner was mildly limited in activities of daily living and in maintaining social functioning, while she was moderately limited in maintaining concentration, persistence or pace. (R. at 228.) Leizer found that Stiltner was not limited by repeated episodes of decompensation. (R. at 228.) Leizer stated that there had been no significant changes in Stiltner's mental health condition since the ALJ's decision dated April 27 2004, and a recent follow-up exam by Stiltner's treating physician

-22-

revealed no significant psychological observation. (R. at 232.) Therefore, Leizer indicated that Stiltner's allegation of disability due to a mental disorder was partially credible but that she was still capable of simple, unskilled, nonstressful work. (R. at 232.)

On August 14, 2004, Donald Hiers, Ph.D., examined Stiltner and wrote a psychology report for Stiltner. (R. at 238-43.) Hiers observed that Stiltner had a slow, shuffling gait due to apparent back and leg pain and exhibited awkwardness in fine motor movement as her hands were shaky. (R. at 238.) Stiltner reported that she felt a burning sensation in the bottoms of her feet. (R. at 238.) Hiers further observed that Stiltner was shy and reserved and was slow and lethargic. (R. at 238.) Stiltner was unable to complete the serial sevens or interpret proverbs but completed simple mathematics problems. (R. at 240.) From his examination, Hiers determined that Stiltner had borderline intellectual functioning and was emotionally depressed and anxious. (R. at 240.) Hiers found Stiltner's social skills adequate because she could relate to him relatively well. (R. at 240.) Hiers administered a PAI, which he disqualified from clinical analysis due to an elevation in the infrequency scale that was two standard deviations above the mean. (R. at 241.) Hiers found that Stiltner's random responses elevated the infrequency scale. (R. at 241.) Nonetheless, Hiers found the profile to be similar to that conducted in September 2003. (R. at 241.) Hiers diagnosed Stiltner with a major depressive disorder, which was chronic without psychotic features and due to a general medical condition. (R. at 241.) Hiers found this diagnosis to be of mild to moderate severity. (R. at 241.) Hiers further assessed Stiltner with a mild to moderate generalized anxiety disorder; a mild to moderate memory impairment, which was recent and remote; and mild to moderate borderline intellectual functioning at estimate based on vocabulary, fund of knowledge and

educational level. (R. at 242.) Hiers assessed Stiltner with a current Global Assessment of Functioning, ("GAF"), of 55.[2] (R. at 242.) Hiers determined the following work-related activities were limited by Stiltner's impairment: the ability to understand and remember, the ability to maintain concentration and persistence, social interaction and adaptation. (R. at 243.)

Also on August 14, 2004, William E. Stanley, M.Ed., completed a Medical Source Statement Of Ability To Do Work-Related Activities (Mental) for Stiltner. (R. at 244-46.) Stanley found that Stiltner was mildly to moderately limited in her ability to remember locations and work-like procedures, to understand, remember and carry out short and simple instructions, to understand, remember and carry out detailed or complex instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule and to maintain regular attendance and to be punctual, to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being distracted by them, to make simple work-related decisions, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace. (R. at 244.) Stanley also found that Stiltner was mildly to moderately limited in her ability to interact appropriately with the public, supervisors and co-workers, to respond appropriately to work pressures in a normal work setting and to respond appropriately to changes in a routine work setting. (R at 245.)

---

[2]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 51-60 indicates "moderate symptoms...OR moderate difficulty in social, occupational or school functioning. . ." DSM-IV at 32.

### III. Analysis

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. §416.920 (2005); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 416.920 (2005). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2005).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy the burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated February 25, 2005, the ALJ denied Stiltner's claim. (R. at

-25-

14-23.) The ALJ found that Stiltner had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 22.) The ALJ found that Stiltner suffered from severe anxiety, depression and pain in her back, legs, hips, left arm and left shoulder. (R. at 22.) The ALJ found, however, that Stiltner did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 22.) The ALJ also found that Stiltner's allegations regarding her limitations were not totally credible. (R. at 22.) After considering the medical opinions of record regarding the severity of Stiltner's impairments and the testimony from a vocational expert, the ALJ found that Stiltner had the residual functional capacity to perform simple, unskilled light work that did not expose her to excessive stress and did not involve interaction with the public. (R. at 22.) Based on Stiltner's residual functional capacity, the ALJ found that Stiltner was unable to perform her past relevant work. (R. at 22.) The ALJ determined that there were a significant number of jobs in the national economy that Stiltner could perform, such as work as a food service worker, sandwich maker, salad bar attendant, maid, office cleaner, laundry worker, hand packer, bagger and off bearing and preparation cook. (R. at 22.) Thus, the ALJ found that Stiltner was not under a disability as defined by the Act at any time through the date of the decision and not eligible for benefits. *See* 20 C.F.R. § 416.920(g) (2005).

Stiltner argues that the ALJ's decision was not based on substantial evidence. In particular, Stiltner argues that the ALJ erred in finding that she did not meet the listing for mental retardation, an anxiety-related disorder or a depressive disorder. (Brief In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 10.) Stiltner further argues that if the court should find that the ALJ erred in

finding that she did not meet the listing for mental retardation, the ALJ also erred in finding that she did not have a severe impairment of borderline intellectual functioning. (Plaintiff's Brief at 10.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided that the decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Stiltner argues that the ALJ erred in finding that she did not meet the listing for mental retardation. (Plaintiff's Brief at 10.) To qualify as disabled because of mental

-27-

retardation under 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05(C), a claimant must be "significantly subaverage [in] general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period: i.e., the evidence demonstrates or supports onset of the impairments before age 22." In addition, a claimant's condition must meet two requirements: (1) a valid verbal, performance or full-scale IQ score of 60 through 70 and (2) a physical or other mental impairment imposing additional and significant work-related limitation of function.

Based on my review of the record, I find that substantial evidence supports the ALJ's finding that Stiltner's impairments did not meet or medically equal the requirements under 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05(C). First, there is not substantial evidence that Stiltner suffered from an impairment that met the diagnostic description for mental retardation and existed before the age of 22. Donald Hiers, Ph.D., in his psychological examination of Stiltner, determined that Stiltner suffered from borderline intellectual functioning, a description that Stiltner also used in her brief to characterize her condition. (R. at 242.) However, borderline intellectual functioning does not satisfy the claimant's burden of proving mental retardation. *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999). Even if Stiltner met the diagnostic description for mental retardation, there is no evidence that her condition existed before the age of 22. In fact, Stiltner's early test scores were above average and did not suggest that she was a mentally retarded child. (R. at 277.) As an adult, Stiltner worked as a nurse assistant for more than 10 years and was able to tend to her personal needs and household chores. (R. at 148, 179, 239-40, 277.)

Second, substantial evidence does not exist to support a finding that Stiltner

-28-

had a valid verbal, performance or full-scale IQ score of 60 through 70. According to the regulations, IQ scores should be consistent with the claimant's developmental history and her degree of functional limitation. 20 C.F.R. Pt. 404, Subpt P, App. 1, § 12.06. Brian Warren, Ph.D., determined that Stiltner had a full-scale IQ score of 62, a verbal IQ score of 64 and a performance IQ score of 64 and further opined that Stiltner had likely functioned at this level her entire life. (R. at 181.) These are the only IQ scores of record. However, these scores are not consistent with Stiltner's history and degree of functional limitations. Dr. Thomas Schact, M.D., the medical expert at Stiltner's second hearing, analyzed Warren's findings. Dr. Schact noted that Warren had no basis for his opinion that Stiltner had lifelong mental retardation. (R. at 276-77.) Dr. Schact also found that Warren's opinions were inconsistent with Stiltner's early test scores and grades, which did not suggest that Stiltner was a mentally retarded child. (R. at 277.) Furthermore, Dr. Schact expressed concern that the test results may be invalid due to Stiltner obtaining assistance from her mother during the test. (R. at 179, 277.) In his findings, the ALJ placed great weight on Dr. Schact's testimony and considered the testimony consistent with his own findings. (R. at 20.) Warren's findings also are contradicted by Stiltner's past work history and daily activities. (R. at 148, 179, 239-40, 277.) Therefore, this court finds that substantial evidence supports the ALJ's finding that Stiltner did not meet the listing for mental retardation.

Based on the court's finding that substantial evidence does support the ALJ's finding that Stiltner did not meet the listing for mental retardation, it is not necessary to address Stiltner's argument that the ALJ erred in finding that Stiltner did not have a severe impairment of borderline intellectual functioning.

Stiltner further argues that the ALJ erred in finding that she did not meet the listing for her anxiety-related disorder and depressive disorder. (Plaintiff's Brief at 10.) In order for a claimant to be disabled by reason of an anxiety-related disorder, 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.06 requires the claimant satisfy the requirements in subpart A and B or subpart A and C.[3] Subpart A provides the signs and symptoms required to establish the medical impairment. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06. Subpart B is met when a claimant proves that her disability results in either a marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06. Subpart C is satisfied when the claimant has a complete inability to function independently outside the area of her home. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06.

The requirements in 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04 for qualifying for disability based on an affective disorder are met when a claimant meets the conditions in either subpart A and B or subpart C.[4] Similar to the subparts in Listing § 12.06, subpart A in Listing § 12.04 provides the signs and symptoms necessary to establish the medical impairment, while subpart B provides the requisite level of severity of the impairment: a marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in

---

[3]Stiltner does not allege that she met the requirements of subpart C. (Plaintiff's Brief at 16-18.)

[4]Stiltner does not allege that she met the requirements of subpart C in this listing either. (Plaintiff's Brief at 16-18.)

-30-

maintaining concentration, persistence or pace; or repeated episodes of decompensation. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.06. Subpart C pertains to chronic affective disorders of at least two years that have caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.

I find that substantial evidence exists to support the ALJ's finding that Stiltner did not have an impairment that met or medically equaled the requirements, respectively, in Listing §§ 12.04 and § 12.06. While the ALJ found both Stiltner's anxiety-related disorder and depression to be severe, there is no evidence that either of these impairments resulted in marked limitations in functioning. In making his decision, the ALJ relied on the opinions of Dr. Stanley, Milan and Leizer, all of which found that Stiltner suffered from no more than mild to moderate limitations and no episodes of decompensation. (R. at 162, 214-15, 244-46.) The ALJ also considered that Stiltner had not been treated by a mental health professional but relied exclusively on treatment with her primary care physician, Dr. McVey, for mental health treatment. (R. at 19, 21.) The ALJ noted that while Stiltner had taken Ativan for years, the record was silent as to the symptoms, which precipitated the prescription, and Stiltner's response to the drug. (R. at 19.) The ALJ further found Stiltner's record lacking with regard to her treatment with Effexor, particularly the length of time she had taken it and her symptoms, for which she was prescribed the medication. (R. at 19.) Moreover, Stiltner had never been hospitalized for her mental health condition. (R. at 21.) Therefore, the ALJ found Warren's opinion, based upon a one-time consultation with Stiltner for purposes of obtaining SSI, inconsistent

-31-

with the majority of evidence in the record. The ALJ also disqualified Warren's test results because of impropriety that occurred during testing. (R. at 19.) Accordingly, I find substantial evidence supports the ALJ's finding that Stiltner did not suffer from a severe impairment that met or medically equaled the requirements in §§ 12.04 and § 12.06.

## IV. Conclusion

For the foregoing reasons, I will sustain the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

An appropriate order will be entered.

DATED:     The 28th day of March, 2006.

_Glen M. Williams_
SENIOR UNITED STATES DISTRICT JUDGE

-32-